UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ) | |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| ) | |
| v. ) | CRIMINAL ACTION |
| ) | NO. 10-10067-WGY |
| CRAIG SPARKS, ) | |
| ) | |
| ) | |
| Defendant. ) | |
| ) | |

MEMORANDUM

YOUNG, D.J.                                    November 10, 2010

## I.   Factual Background

### A.   Facts Relating to the Charge of Armed Bank Robbery

On January 4, 2010, at approximately 12:24 p.m., two white males robbed a Bank of America branch("Bank") located in Waltham, Massachusetts.  Gov't Jan. 22 Aff. ¶ 5.  Both robbers wore ski masks, dark-colored hooded sweatshirts, and brandished what appeared to be handguns.  Id.  The robbers approached tellers, demanded money, and fled with approximately $10,676.00 in U.S. currency.  Id.  A witness outside the bank observed the robbers enter a red sports utility vehicle and flee the area.  Id.

Meanwhile, on this same day, approximately ten minutes earlier (at around 12:15 p.m.) Special Agents from the Federal Bureau of Investigation ("FBI") initiated surveillance on a black Chrysler which was parked on a public street in Waltham.  Id. ¶

1

6.   The vehicle was registered to the defendant Craig Sparks's mother, but was primarily used by Sparks himself.  Id.  The vehicle was located through a Global Positioning System ("GPS") device that had previously been affixed to the external undercarriage of the vehicle.[1]  At the time the Agents initiated surveillance, the engine of the vehicle was running but no one was in, or near, the vehicle.  Id.  The vehicle was parked roughly two blocks away from the Bank.  Id.

Approximately ten minutes after surveillance of the Chrysler was initiated, Agents found themselves in the most fortuitous of positions – they observed a red Jeep Cherokee approach at a high rate of speed and pull into a driveway across from the Chrysler. They watched two individuals wearing dark-colored hooded sweatshirts get out of the Jeep, run across the street, enter the Chrysler, and drive off.  Id.  One of the individuals was carrying a dark-colored bag.  Id.

After observing the switch from "getaway car" to "clean car," and learning of the bank robbery several minutes later, the investigators attempted to follow the Chrysler but lost visual contact shortly after it drove away.  Id. ¶ 8.  Using the GPS, visual surveillance of the Chrysler was reacquired on northbound Interstate 95.  Id.  Shortly thereafter, a Massachusetts State Police cruiser initiated a traffic stop of the vehicle with FBI

_____

[1] Facts regarding the GPS device are detailed infra.

2

agents directly behind.  Id.  As the Chrysler entered the
breakdown lane the driver slammed on the brakes and drove the
vehicle into a ditch alongside Interstate 95.  Id.  Two white
males jumped from the Chrysler and fled into the woods along the
Interstate.  Id.  Special Agents pursued the men but the suspects
evaded immediate capture.  Id.  A number of state, local, and
federal law enforcement officers joined the search.  Id.

In the snowy woods through which the two men had fled,
investigators found $1,381 in United States currency and a
backpack containing clothing, including two hooded sweatshirts.
Id. ¶ 11.  One suspect, identified as Benjamin Michaud, was
apprehended sometime after 1:00 p.m. in Lincoln, Massachusetts
with $9,284 in United States currency wrapped in money bands from
the bank where the robbery had occurred.[2]  Id. ¶ 9.

During a safety sweep of the abandoned Chrysler, two BB
guns, which looked like the weapons used in the bank robbery,
were located on the floor of the front passenger seat.  Id. ¶ 12.
After obtaining a search warrant, investigators impounded and
thoroughly searched the Chrysler.  They found, inter alia,
footwear consistent in appearance with those worn by the robbers,
a cell phone with the battery removed, a knife, a dagger, two
white gloves turned inside out as if they had been worn and

_____

[2] Michaud was charged with armed bank robbery and, on
October 20, 2010, proffered a conditional guilty plea.

removed, a screwdriver, and Sparks's wallet, containing several pieces of his identification.  Id. ¶ 12-13.

Investigators also examined information from the GPS device that was affixed to the vehicle.  Id. ¶ 14.  The GPS data indicated that the Chrysler was in the area of Sparks's apartment on the morning of January 4, 2010; that the Chrysler traveled to Charlestown, Massachusetts and moved around to various locations in Charlestown for approximately 30 minutes;[3] and that the vehicle then traveled to Waltham, ending up on the street where Agents initially observed it.  Id.

Based on the above evidence, and more, the defendant Sparks was arrested for the bank robbery on February 16, 2010, in Maine, and transferred to Massachusetts on February 23, 2010.

### B.   Facts Relating to the Global Positioning System

The GPS device was able to provide information as to its location in "real time" and to record its location as the Chrysler moved from place to place.  Gov't Sept. 16 Aff. ¶ 3.  It did so by communicating with satellites to get a "fix" on its position and then connecting with a service provider.  Id.  FBI Agents working the case were able to log onto a website and obtain information as to the location of the GPS device, and thus the vehicle, as it was moving.  Id.  This information was also stored and accessible for later review.  Id.

---

[3] The "getaway" Jeep was determined to have been stolen in Charlestown, Massachusetts.  Gov't Jan. 22 Aff. ¶ 14.

The GPS device ran on its own battery for power, and drew no power from the Chrysler itself.  Id. ¶ 3.  The original power supply failed and so, on December 28, 2009, the FBI replaced the battery, and reaffixed the GPS device.  Id.  The GPS device was attached and reattached without a warrant.  Def.'s Mem. 4, n.1.

At the time the GPS device was first attached to Sparks's vehicle on December 24, 2009, the FBI suspected that Sparks had committed three armed bank robberies in Massachusetts in the preceding three months.  Gov't Sept. 16 Aff. ¶ 2.  Believing that Sparks would commit further robberies, and having seen Sparks driving the Chrysler, the FBI decided to place the GPS device on this vehicle.  Id.  The GPS device was affixed between 2:00 a.m. and 4:00 a.m., eleven days prior to the date of the bank robbery. At oral argument, the government conceded that at the time agents placed the GPS device on the vehicle it was parked in a private open-air parking lot used by the tenants of two, separate, multi-unit residential buildings.  Tr. Mot. Suppress 7.  Sparks rented an apartment in one of these buildings at the time.  The street that the apartment building and parking lot were on was a private street.

## II.  ANALYSIS

The defendant, Craig Sparks, moved to suppress evidence obtained following the placement of the GPS device on his

vehicle.[4]  Sparks argued for application of the exclusionary rule based on violations of his First[5] and Fourth Amendment rights.

> **A.   General Fourth Amendment Standard**

The Fourth Amendment secures the right of an individual "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" and provides that this right "shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  Although the Fourth Amendment protects against certain governmental intrusions, it has never been held to provide a generalized right to privacy.  See Katz v. United States, 389 U.S. 347, 350 (1967).  Instead, constitutional protections attach only when the governmental "search" or "seizure" implicates a constitutionally protected interest.[6]  United States v. Dionisio, 410 U.S. 1, 15

---

[4] At the time Michaud conditionally pleaded guilty he also moved to join this motion to suppress.  The Court allowed Michaud to join the motion but did not hear argument as to Michaud.  The Court notes without deciding, however, that as a temporary passenger in Sparks's vehicle, Michaud stands in a significantly worse position than Sparks as a challenger to the legality of the GPS device.

[5] Sparks's argument that the evidence must be excluded because the government violated his First Amendment right to free association is without merit.  The exclusionary rule is a judicial remedy for violations of the Fourth Amendment, not the First Amendment.  See Mapp v. Ohio, 367 U.S. 643, 655-66 (1961).

[6] A search occurs when a state actor infringes upon an expectation of privacy society considers reasonable.  A seizure occurs when the state interferes with an individual's possessory

(1973).  Sparks bears the burden of establishing this protected
interest by demonstrating that he maintained a legitimate
expectation of privacy in the place searched.  <u>United States</u> v.
<u>Thornley</u>, 707 F.2d 622, 624 (1st Cir. 1993).  The modern test for
analyzing the expectation question, as articulated in Justice
Harlan's concurrence in <u>Katz</u>, is a two-part inquiry: first,
whether the defendant has exhibited an actual, subjective,
expectation of privacy; and second, whether such subjective
expectation is one which society is willing to recognize as
objectively reasonable.  389 U.S. at 361 (Harlan, J.,
concurring).

     If the government intrudes upon a reasonable expectation of
privacy without a warrant, the invasion is presumptively
unconstitutional.  Likewise, if no reasonable expectation of
privacy is infringed, the government action does not implicate
the Fourth Amendment.  The two-prong <u>Katz</u> analysis, therefore,
presents a threshold determination that must be satisfied before
inquiry into the constitutionality of a search or seizure is
required.  <u>See</u> <u>id.</u>

---

interest in property or freedom of personal movement.  It is,
however, practically irrelevant "whether a particular
governmental intrusion is classified as a 'search' or as a
'seizure.'  What matters is whether it violates an individual's
legitimate expectation of privacy.  Therefore, it is not
necessary to speculate whether [the government's action]
'searches' or 'seizes' anything."  <u>United States</u> v. <u>Bailey</u>, 628
F.2d 938, 940 (6th Cir. 1980).

**B.    Reasonable Expectation of Privacy**

In analyzing the expectation of privacy in this case there are two main issues before the Court: (1) whether the installation of the GPS device on the Chrysler infringes upon any reasonable expectation of privacy, and (2) whether monitoring the location of the GPS device, and thus the vehicle, infringes upon any reasonable expectation of privacy.

**1.    Installation of the GPS**

Regarding the first issue – the installation of the GPS device – it is argued that there are two privacy interests potentially at stake: an interest in the private parking lot in which the vehicle was parked and an interest in the exterior of the vehicle.

**a.    Private Parking Lot**

The parking lot in which Sparks's car was parked and the adjoining street were private property.  Unfortunately for Sparks, notions of property law are only marginally relevant to this Court's Fourth Amendment analysis.  See United States v. Cruz Pagan, 537 F.2d 554, 558 (1st Cir. 1976) ("Whether or not the agents' entry was a technical trespass is not the relevant inquiry.").  Instead, the focus of this Court's inquiry must be on expectations of privacy.  What's more, even though these areas were private, they were not private property owned by the

defendant.  Any trespass[7] committed by the police was a trespass against the owner of the residential building (who is not before this Court), and not against Sparks.  See Commonwealth v. Thomas, 358 Mass. 771, 774 (1971) (Cutter, J.).

Trespass aside, the FBI Special Agents did not invade any constitutionally protected area within Sparks's dwelling or curtilage.  It is without question that private residences are entitled to the utmost protection from governmental intrusion. United States v. Karo, 468 U.S 705, 714 (1984).  There is also space surrounding the home, the so-called curtilage, that is so intimately tied to the home that it ought be placed under the umbrella of protection afforded the home.  United States v. Dunn, 480 U.S. 294, 300 (1987).  Because the Fourth Amendment "protects people, not places," the courts have tended to de-emphasize physical boundaries and have focused instead on whether the area intruded upon provided any privacy associated with the home.  See Katz, 389 U.S. at 351; see also Oliver v. United States, 466 U.S. 170, 180 (1984) (noting that the curtilage analysis hinges on whether the area harbors "intimate activity associated with the 'sanctity of a man's home and the privacies of life.'" (quoting Boyd v. United States, 116 U.S. 616, 630 (1886))).  To guide this inquiry, the Supreme Court has established a four-factor test: (1) the proximity of the area claimed to be curtilage to the home;

---

[7] As the issue was not presented, this Court makes no findings as to whether a trespass occurred.

(2) whether the area is included within an enclosure surrounding the home; (3) the nature of the uses to which the area is put; (4) the steps taken by the resident to protect the area from observation by people passing by.  <u>Dunn</u>, 480 U.S. at 301.

Under factual circumstances strikingly similar to those before this Court, the Ninth Circuit applied the four-factor test to a parking area used by residents and guests, located between two apartment buildings, and ruled the area was excluded from the defendant's curtilage.  <u>United States</u> v. <u>Soliz</u>, 129 F.3d 499, 503 (9th Cir. 1997), <u>overruled on different grounds by</u>, <u>United States</u> v. <u>Johnson</u>, 256 F.3d 895 (9th Cir. 2001).  The Ninth Circuit stated that although the parking area was adjacent to the residence, and there was a fence surrounding the property, the fence did nothing to prevent outside observation of the lot, and there was no evidence that the area was used for anything other than the "mundane, open and notorious activity of parking."  <u>Id.</u> at 502-04.

The parking area in which Sparks parked the Chrysler similarly must be excluded from the curtilage of his rented apartment.  Although the parking lot sat in close proximity to his apartment building, the remaining three factors weigh against a ruling of curtilage.  The parking area was in no way bounded or enclosed, and it has not been alleged that the lot was used for anything other than parking.  Further, the only attempts to keep the area protected were two "Private Property No Trespass" signs,

one affixed to a fence beyond Sparks's apartment building and the
other posted on the facade of the neighboring apartment building.
Gov't Sept. 16 Aff. ¶ 4.  As there is no indication that the lot
was used for private activities, nor did it provide any actual
privacy, the Fourth Amendment will not be extended to protect its
contents.  See United States v. Pineda-Moreno, 591 F.3d 1212,
1215 (9th Cir. 2010) (no reasonable expectation of privacy in
driveway, regardless of whether it was within the curtilage,
because the area was only "semi-private" (quoting United States
v. Magana, 512 F. 2d 1169, 1171 (9th Cir. 1998) (internal
quotation marks omitted)); see also Thomas, 358 Mass. at 774-75
("In a modern urban multifamily apartment house, the area within
the 'curtilage' is necessarily much more limited . . . .  [A]
tenant's 'dwelling' cannot reasonably be said to extend beyond
his own apartment and perhaps any separate areas subject to his
exclusive control.").

Moreover, as a tenant, Sparks may allege no reasonable
expectation of privacy in the lot or street because these were
common areas, available for the shared benefit of the residents.
"[I]t is now beyond cavil in this circuit that a tenant lacks a
reasonable expectation of privacy in common areas of an apartment
building."  United States v. Rheault, 561 F.3d 55, 59 (1st Cir.
2009) (quoting United States v. Hawkins, 139 F.3d 29, 32 (1st
Cir. 1998) (internal quotation marks omitted)) (deciding that
there is no objectively reasonable expectation of privacy in the

11

third-floor landing of an apartment building, especially for a second-floor tenant); Hawkins, 139 F.3d at 32-33 (ruling that no reasonable expectation of privacy existed in the unenclosed areas of the building's basement where storage compartments assigned to each tenant were located); Cruz Pagan, 537 F.2d at 558 (holding that a person has no reasonable expectation of privacy in a common parking garage of an apartment building).

Common areas are open to all residents and those whom they may invite.  No one tenant has the right to exclude others from using the area, and, therefore, no reasonable person would think that he could store private items in the common area and be free of public scrutiny.  Rheault, 561 F.3d at 61.  There can be no reasonable expectation of privacy, then, in the open-air, shared, lot in which Sparks's parked the Chrysler.

### b.   Exterior of the Vehicle

Having established that Sparks did not have a reasonable expectation of privacy in the parking lot, this Court must now decide whether he nonetheless maintained an expectation of privacy in the exterior of his vehicle.

### (1)   Subjective Expectation

To begin, the analysis into subjective expectations turns on whether the movant was "seek[ing] to preserve as private" the area or item at issue.  Id. at 351.  Sparks apparently took no efforts to protect or shield his vehicle from passersby nor did he otherwise demonstrate or allege any subjective expectation of

privacy.  If Sparks sought to keep his vehicle private he could have found an enclosed parking garage, covered his vehicle, or otherwise removed it from public view.  Such efforts are admittedly asking a lot of the movant; Sparks, however, is asking a lot of this Court to protect that which he did not protect himself.

### (2)   Objectively Reasonable Expectation

Even were this Court to conclude that Sparks maintained a subjective expectation of privacy in the exterior of his vehicle, this expectation is not one that society is willing to recognize as reasonable.  The Supreme Court has been clear that motor vehicles are entitled to a significantly diminished expectation of privacy because their "function is transportation and [they] seldom serve[] as one's residence or as the repository of personal effects."  See Cardwell v. Lewis, 417 U.S. 583, 590 (1974).  More specifically, there is no reasonable expectation of privacy in the exterior or undercarriage of a vehicle.  See New York v. Class, 475 U.S. 106, 114 (1986) ("The exterior of a car, of course, is thrust into the public eye, and thus to examine it does not constitute a 'search.'"); United States v. Rascon-Ortiz, 994 F.2d 749, 754 (10th Cir. 1993) ("The undercarriage is part of the car's exterior, and as such, is not afforded a reasonable expectation of privacy.").

The minimal physical intrusion associated with affixing a GPS device will not, standing alone, create a Fourth Amendment

violation.  See Cardwell, 417 U.S. 583 (no Fourth Amendment
unreasonable search or seizure in removing paint scrapings from a
parked car); United States v. Johnson, 431 F.2d 441 (5th Cir.
1970) (allowing police officer, without warrant, to open car door
to inspect vehicle identification number on inside panel).
"[One] may reasonably expect that strangers will leave his car
alone, but that is not an expectation of privacy; it is an
expectation of respect for one's property rights."[8]  People v.
Weaver, 12 N.Y.3d 433, 450 (2009) (Smith, J., dissenting).  Thus,
although the idea of a government agent touching one's vehicle
may raise eyebrows, it does not raise any cognizable
constitutional concerns.

Because Sparks had no reasonable expectation of privacy
either in the shared parking lot or in the exterior of his
vehicle, the placement of the GPS device on the vehicle cannot be
considered a search or seizure.

## 2.  Monitoring of the GPS

Separate and distinct from any privacy interest in the
exterior of a motor vehicle or in a private parking lot is the
potential privacy interest in one's movements in the vehicle.
The Supreme Court has held that "[a] person travelling [sic] in

---

[8] Even this expectation of respect is tempered when we enter
the public sphere.  One ought expect that a child may duck under
a parked vehicle to track an errant ball, or that the local
restaurant may place an advertising menu under the wiper blade.
These small intrusions may be bothersome, or even statutorily
proscribed, but are nonetheless an expected part of daily public
life.

an automobile on public thoroughfares has no reasonable
expectation of privacy in his movements from one place to
another." United States v. Knotts, 460 U.S. 276, 281 (1983); see
also Katz, 389 U.S. at 351 ("What a person knowingly exposes to
the public . . . is not a subject of Fourth Amendment
protection."). It is true, as Sparks notes, that data obtained
from the device while within private residences would have to be
suppressed. Karo, 468 U.S. at 714. The government, however,
does not purport to rely on any information from the GPS while it
was located in constitutionally protected areas. The relevant
uses of the GPS device were to locate the vehicle on a public
street in Waltham, and to reestablish visual surveillance on
Interstate 95. The monitoring of the GPS device on Sparks's
vehicle, therefore, does not implicate any privacy interests and
cannot be considered a search. See id. at 721 (holding that
evidence need not be suppressed where the government used a
tracking device to monitor movement of vehicle as it traveled on
public streets).

Sparks argues that, although society may not recognize the
privacy interests in single public trips, he does maintain a
reasonable expectation of privacy in the aggregate of his
travels. The first rationale for this argument is essentially
that the whole of one's movements during the course of
surveillance is not actually exposed to the public because the
likelihood that anyone will observe all those movements is

essentially nil.  See United States v. Maynard, 615 F.3d 544, 565-66 (D.C. Cir. 2010).  The proper inquiry, however, is not what a random stranger would actually or likely do, but rather what he feasibly could.  See Smith v. Maryland, 442 U.S. 735, 745 (1979).

Attempting to tie improbability to illegality is inappropriate in light of several Supreme Court Fourth Amendment decisions concerning new technology.  See United States v. Jacobsen, 466 U.S. 109, 122 (1984) ("The concept of an interest in privacy that society is prepared to recognize as reasonable is, by its very nature, critically different from the mere expectation, however well justified, that certain facts will not come to the attention of the authorities."); see also Orin S. Kerr, Four Models of Fourth Amendment Protection, 60 Stan. L. Rev. 503, 543 (2007) (explaining the various analytical frameworks used by the Supreme Court to decide Fourth Amendment cases).  Many citizens would think it unlikely that government agents would rifle through their trash as it sits on the curb, or rent an airplane solely to conduct aerial surveillance of their residence, and yet these acts are firmly outside the reach of the Fourth Amendment.  See California v. Greenwood, 486 U.S. 35 (1988); Ciraolo, 476 U.S. 207.  Moreover, with the proliferation of private GPS use, and with media coverage of stories like the use of GPS devices to track Scott Peterson in the aftermath of his wife's death, see Judge Allows GPS Evidence in Peterson Case,

CNN.com, Feb. 17, 2004, http://www.cnn.com/2004/LAW/02/17/ peterson.trial/index.html, it is unconvincing to argue that society is completely unaware of the power of these devices. Rather than using a probabilistic approach to determine reasonable expectations of privacy, in the context of governmental use of new technologies, the Supreme Court repeatedly has focused on whether the nature of the information revealed is private and thus worthy of constitutional protection. See Kerr, supra, at 512.  This Court, then, is not persuaded by Sparks's likelihood analysis.

Sparks also argues that the aggregate of his travels became something of a synergism – the whole of his movements being more private than his individual travels.  Citing solely to a recent decision from the U.S. Court of Appeals for the District of Columbia Circuit, Sparks alleges that the longer the GPS was placed on the car, the more his privacy was invaded because it gave the government a wealth of information about his personal preferences.  See Maynard, 615 F.3d at 558, 562 ("Prolonged surveillance reveals types of information not revealed by short-term surveillance, such as what a person does repeatedly, what he does not do, and what he does ensemble. These types of information can each reveal more about a person than does any individual trip viewed in isolation."); see also, April A. Otterberg, Note, GPS Tracking Technology: The Case For Revisiting Knotts and Shifting the Supreme Court's Theory of the Public

Space Under the Fourth Amendment, 46 B.C. L. Rev. 661, 685 n.171, 697-98 (2005) (urging courts to view the aggregation of one's travels, and the private details it reveals, as the new "private space" under the Fourth Amendment and to require a warrant for prolonged surveillance).

While this may be factually true, it is legally unconvincing.  Although the continuous monitoring may capture quantitatively more information than brief stints of surveillance, the type of information collected is qualitatively the same.  Sparks's aggregation argument against prolonged surveillance, as supported by the court in Maynard, is also practically unappealing.  The exclusionary remedy for Fourth Amendment violations is a strong and blunt instrument.  See Kerr, supra, at 527.  To avoid improper application of this strict remedy it is important to provide the police with clear ex ante rules.  Id.  The court in Maynard, however, leaves police officers with a rule that is vague and unworkable.  It is unclear when surveillance becomes so prolonged as to have crossed the threshold and created this allegedly intrusive mosaic.  What's more, conduct that is initially constitutionally sound could later be deemed impermissible if it becomes part of the aggregate.  Finally, and as expounded upon infra, a rule prohibiting prolonged GPS surveillance due to the quantity or quality of information it accumulates would also incidentally outlaw warrantless visual surveillance and this Court is

unwilling, and unable, to extend the reach of the Fourth Amendment that far.  See Knotts, 460 U.S. at 282-85.  Sparks's argument, then, that the aggregate of his travels are entitled to more constitutional protection than his individual trips, must fail.

### 3.   Precedent

This Court is persuaded that this case falls within the ambit of the Supreme Court's holding in Knotts that the warrantless placement of a beeper tracking device inside a chloroform container, which allowed police officers to follow the defendant's movements along public roads, did not violate the Fourth Amendment because there was no reasonable expectation of privacy in public travel.[9]  460 U.S. 276.

Sparks asks this court to disregard Knotts by arguing that modern GPS devices are so technologically advanced that they cannot be compared to primitive beeper devices.  It is true that the GPS device used here was highly sophisticated, allowing the FBI accurately to locate Sparks's vehicle from any computer, at any time of the day or night, and to store a record of his travels for the entirety of the eleven day period.[10]  This is

---

[9] Sparks's argument that the First Circuit's decision in United States v. Moore, 562 F.2d 106, 112 (1st Cir. 1977), is controlling is unpersuasive.  Moore's 1977 holding that police needed probable cause to install a beeper on a vehicle is no longer good law following the Supreme Court's 1983 holding in Knotts.

[10] This technology, however, is not the type of highly sophisticated equipment that would require a warrant under Kyllo

certainly more advanced than the relational "pings" of the beepers of yesteryear.  A similar argument could have been made regarding the telephone in 1880 and the video camera in 1950. See Weaver, 12 N.Y.3d. at 448 (Smith, J., dissenting). Undoubtedly, a quarter-century from now, the GPS device used in this case will seem antiquated.

Yet it is not the mere "newness" of technology that might warrant reevaluation of Supreme Court precedent, but rather any increased intrusion into zones of privacy.  As noted in Kyllo v. United States, 533 U.S. 27, 34 (2001), if technology allows the government to sidestep the warrant requirement by providing access into otherwise protected areas, or to protected information, it ought be considered an unreasonable search.  If, however, the technology merely provides a replacement for an activity that is not a search within the meaning of the Fourth Amendment, then the use of technology does not render the activity illegal.  See United States v. Garcia, 474 F.3d 994, 997 (7th Cir. 2007).

Warrantless visual surveillance or "tailing" of Sparks unquestionably would have been permissible and would have revealed to the FBI all of the same details the GPS device

_____

v. United States, 533 U.S. 27, 40 (2001).  GPS devices are widely available to the public at large.

provided,[11] only at a much higher cost, and possibly at a higher
risk to law enforcement officers.[12]  Where the use of a tracking
device serves only as a technological substitute for an otherwise
legal activity, it must remain constitutionally sound.[13]  See
Knotts 460 U.S. at 284 ("[A] principal rationale for allowing
warrantless tracking of beepers, particularly beepers in or on an
auto, is that beepers are merely a more effective means of
observing what is already public."); see also Pineda-Moreno, 591
F.3d at 1216.

---

[11] In fact, visual surveillance would likely have revealed a
great deal more information than GPS surveillance alone.
Although the GPS device gives a detailed report of the vehicle's
location at a given time it tells nothing about who was driving
the car, where the individual traveled once he has left the
vehicle, or what venues could be found at a particular location.

[12] "GPS devices cost between a few hundred dollars and
perhaps $2,500, plus the minimal costs of monitoring.  The U.S.
national average of having a private investigator tail a suspect
is $60 to $65 per hour. . . .  Thus a one-person, sixteen-hour
tail would, on average cost at least $960."  John S. Ganz, It's
Already Public: Why Federal Officers Should Not Need to Use GPS
Vehicle Tracking Devices, 95 J. Crim. L. & Criminology 1325, 1357
(2005).  It is easy to see how the costs associated with any
long-term visual surveillance would quickly overwhelm law
enforcement resources.

[13] It bears mentioning that here, the GPS device here was
used to reestablish visual contact once the Agents had initiated
pursuit.  This arguably means that the use of the GPS technology
enabled police officers to do something that could not be done
with mere visual surveillance.  The Supreme Court in Knotts,
however, expressly certified that such use of technology passed
constitutional muster.  460 U.S. at 285 ("Admittedly, because of
the failure of visual surveillance, the beeper enabled the law
enforcement officials in this case to ascertain the ultimate
resting place of the [object being tracked] when they would not
have been able to do so had they relied solely on their naked
eyes.  But scientific enhancement of this sort raises no
constitutional issues which visual surveillance would not also
raise.").

21

Nothing in the Fourth Amendment prohibits the police from augmenting their sensory abilities. <u>Knotts</u>, 460 U.S. at 282. The Supreme Court has "never equated police efficiency with unconstitutionality." <u>Id.</u> at 284; <u>United States</u> v. <u>Michael</u>, 645 F.2d 252, 259 (5th Cir. 1981) (Clark, J., concurring) ("Requiring the fourth amendment's warrant procedure to be used or excused every time a policeman's senses or abilities are mechanically or electronically enhanced would diminish their usefulness needlessly."). What's more, adopting Sparks's argument would stymie police in their chase to catch up with the technical sophistication of criminals. <u>Weaver</u>, 12 N.Y.3d. at 448 (Smith, J., dissenting).

Officers routinely use highly sophisticated tools including radios, street cameras, radar, helicopters, computers, quick-access files of license tags and fingerprints, and microscopes in the performance of their duties. "[M]ost of these devices and systems intrude into areas of citizens' lives that were private in the day of the deerstalker and magnifying glass" and yet they are permissible today in order to facilitate efficient and accurate law enforcement. <u>Michael</u>, 645 F.2d at 259 (Clark, J., concurring). The law ought embrace those technologies which produce more accurate fact-finding. Advances in technology, like GPS devices, provide neutral and credible evidence and thus facilitate the ultimate (and yet amorphous) goal of "justice."

In the era of modern GPS devices, nearly every federal court of appeals and district court to address this issue has ruled that the government is not required to obtain a warrant before installing or monitoring a hidden GPS device on the exterior of a vehicle.[14]  See United States v. Marquez, 605 F.3d 604, 610 (8th Cir. 2010); Pineda-Moreno, 591 F.3d 1212 (9th Cir. 2010); Garcia, 474 F.3d 994 (7th Cir. 2007); McIver, 186 F.3d 1119 (9th Cir. 1999); United States v. Burton, 698 F. Supp. 2d 1303 (N.D. Fla. 2010); Morton v. Nassau County Police Dep't, No. 05-CV-4000, 2007 WL 4264569 (E.D.N.Y. Nov. 27, 2007); United States v. Moran, 349 F. Supp. 2d 425 (N.D.N.Y. 2005).  The most recent federal case to address the issue, from the Court of Appeals for the District of Columbia Circuit, came down while the instant case was pending.  Maynard, 615 F.3d 544.  The court broke from the Seventh, Eighth, and Ninth Circuits, ruling that Knotts was not controlling, and held that the placement of a GPS on the defendant's car for four weeks was a search and thus

---

[14] State courts have split as to whether the monitoring of a GPS device constitutes a search under their respective state constitutions.  Several state supreme courts, including that of Massachusetts, have ruled that the warrantless monitoring of GPS devices violates their state constitutions.  Commonwealth v. Connolly, 454 Mass. 808 (2009); Weaver, 12 N.Y.3d 433; State v. Jackson, 150 Wash. 2d 251 (2003); State v. Campbell, 306 Or. 157 (1988).  But see Osburn v. State, 118 Nev. 323 (2002) (ruling that attaching GPS to bumper of car was not an unreasonable search).  State constitutions, however, typically provide greater protections than those required under the United States Constitution.  See Weaver, 12 N.Y.3d at 445; see also Herbert P. Wilkins, Judicial Treatment of the Massachusetts Declaration of Rights in Relation to Cognate Provisions of the United States Constitution, 14 Suffolk U. L. Rev. 887 (1980).

required a warrant under the Fourth Amendment.  Id. at 556-58,
563-65.

One of the main rationales underlying the decision in
Maynard was that the use of the GPS device was continuous and
prolonged.  Id.  Although the FBI's use of the GPS device in
monitoring Sparks was technically continuous, the surveillance of
Sparks is readily distinguishable from that which was declared
unconstitutional in Maynard.  In Maynard, the police installed a
GPS device and monitored the defendant twenty-four hours a day
for twenty-eight days.  Id. at 558.  Using the data, the
government was able to establish a pattern consistent with drug
trafficking.  Id. at 567.  In contrast, the FBI installed the GPS
device on Sparks's vehicle for eleven days and used the data to
locate the vehicle in order to initiate visual surveillance.  In
this respect, the use of the GPS device on Sparks's vehicle is
more akin to the use of the beeper in Knotts than that of the GPS
device in Maynard.

The Supreme Court in Knotts expressly reserved the issue of
the constitutionality of twenty-four hour surveillance of private
citizens without judicial knowledge or supervision because the
"reality [of police practice] hardly suggests abuse."  460 U.S. at
283 (quoting Zurcher v. Stanford Daily, 436 U.S. 547, 566
(1978)(internal quotation marks omitted)).  This Court is not
unsympathetic to the sentiment expressed by Chief Judge Kozinski
and his Ninth Circuit brethren, that there is something "creepy"

about continuous surveillance by the government.  <u>United States</u> v.

<u>Pineda-Moreno</u>, 617 F.3d 1120, 1126 (9th Cir. 2010) (denying

petition for rehearing en banc) (Kozinski, J., dissenting).  It

is, of course, easy to envision the worst-case Orwellian society,

where all citizens are monitored by the Big Brother government.[15]

It is simply unreasonable at this point, however, to conclude that

any government – municipal, state, or federal – has the resources,

or interest, to initiate personalized surveillance of every

citizen.[16]  What's more, the type of "dragnet" law enforcement

practices postulated in <u>Knotts</u>, a quarter of a century ago, have

yet to materialize, and are certainly not at issue in this case.

> Whether and what kind of restrictions should, in the
> name of the Constitution, be placed on [mass]
> surveillance when used in routine criminal
> enforcement are momentous issues that fortunately we
> need not try to resolve in this case. . . .  Should

---

[15] This is especially so in light of recent publicity
surrounding the increased use of GPS devices by law enforcement.
<u>See, e.g.</u>, Mina Kim, <u>FBI's GPS Tracking Raises Privacy Concerns</u>,
National Public Radio, Oct. 27, 2010,
http://www.npr.org/templates/story/story.php?storyId=130833487.

[16] But, for examples of widespread government surveillance,
see Protect America Act, 50 U.S.C.A. §§ 1805a to 1805c (2007)
(allowing the government to conduct foreign intelligence
surveillance on targets reasonably believed to be located outside
the United States); Charlie Savage, <u>U.S. Tries to Make it Easier
to Wiretap the Internet</u>, N.Y. Times, A1, Sept. 27, 2010
(explaining a bill, proposed by the Obama administration, that
would require all communications service providers – including
BlackBerry and Facebook – to be technologically capable of
complying with a wiretap order if served, much like telephone
companies are required to do under the Communications Assistance
to Law Enforcement Act, 47 U.S.C. 1001 to 1010 (1994)); James
Risen & Eric Lichtblau, <u>Bush Lets U.S. Spy on Callers Without
Courts</u>, N.Y. Times, A1, Dec. 16, 2005 (revealing the warrantless
surveillance of hundreds, perhaps thousands, of people's phone
calls by order of President Bush).

> government someday decide to institute programs of
> mass surveillance of vehicular movements, it will be
> time enough to decide whether the Fourth Amendment
> should be interpreted to treat such surveillance as a
> search.

Garcia, 474 F.3d at 998.

## III. CONCLUSION

Today this Court must attempt to strike the balance between the constitutional protections of personal privacy and the ability of the government to protect the public through the use of bourgeoning technology.  In the active pursuit of law enforcement "[t]here is a tradeoff between security and privacy, and often it favors security."  Garcia, 474 F.3d at 998.  This is not to say that the government should be permitted to stride, unchecked, through this technological age, but rather that we carefully must determine the point at which our Constitution intervenes.  This Court takes heed of the Supreme Court's recent warning that "[t]he judiciary risks error by elaborating too fully on the Fourth Amendment implications of emerging technology before its role in society becomes clear."  City of Ontario v. Quon, 130 S. Ct. 2619, 2629 (2010).  Today's decision reinforces that, although we are not yet faced with police overreaching, it may very well be near, and this Court and others will be keeping vigilant watch.

Here, the actions taken by the police were directed at essentially public places and activities.  Sparks had neither a subjective nor objectively reasonable expectation of privacy in

26

the open air parking lot, the exterior of his car, or the movement of his vehicle on public streets.  The government's ability to harness advanced technology to assist in effective law enforcement does not change this constitutional analysis.  Given the absence of any reasonable expectation of privacy by Sparks, this Court must conclude that no warrant or other court order is necessary to install or monitor the GPS.

For these reasons, Sparks's motion to suppress was DENIED from the bench on September 22, 2010.


                              /s/ William G. Young
                         _____
                              WILLIAM G. YOUNG
                              DISTRICT JUDGE